No. 20,679.

E. R. WALLINGFORD et al., Partners, etc., *Appellants*, v. THE BUSHTON GRAIN & SUPPLY COMPANY, *Appellee.*

SYLLABUS BY THE COURT.

1. CONTRACT—*Purchase of Grain—Telegram—Confirmation by Letter—When Letter Controls.* Where a contract is made by telephone for the purchase and shipment of grain, followed by a letter of confirmation from the purchaser to the seller setting forth the terms of the contract, the written confirmation controls unless the seller makes known to the purchaser any objection he may have to the terms as stated therein. (*Strong v. Ringle*, 96 Kan. 573, 152 Pac. 631.)

2. SAME—*Breach—Damages—Rescission—Estoppel—Instructions.* In an action to recover damages for defendant's failure to ship wheat according to contract the defense was that defendant had rescinded because plaintiffs refused to pay a draft for the first car shipped. The court properly instructed that if anything was said or done by defendant to induce plaintiffs to believe it had waived the failure to pay the draft it would be estopped afterwards to claim a breach by reason of nonpayment; but in another instruction the court charged in substance that defendant would be relieved from the consequences of such waiver if afterwards and without fault on its part it breached

the contract on some other ground. *Held,* upon the facts stated in the opinion, that the giving of the latter instruction was error, and that it misled the jury.

3. SAME—*Findings—Judgment.* Upon the special findings it is held that plaintiffs are entitled to judgment.

Appeal from Rice district court; DANIEL A. BANTA, judge. Opinion filed February 10, 1917. Reversed. Opinion denying motion for modification of judgment filed April 7, 1917.

*J. Graham Campbell,* and *Ray Campbell,* both of Wichita, for the appellants.

*Samuel Jones,* and *Ben Jones,* both of Lyons, for the appellee.

The opinion of the court was delivered by

PORTER, J.: The action was to recover damages for the failure of defendant to ship 4000 bushels of wheat during the month of August, 1914, according to a contract between the parties. There was a verdict and judgment for defendant, from which plaintiffs appeal.

Wallingford Brothers, grain merchants at Wichita, on July 10, 1914, bought by telephone from the defendant, a grain company at Bushton in Rice county, 5000 bushels of No. 2 hard wheat at sixty-seven cents a bushel, basis Bushton, subject to destination weights and grades, for August shipment via Missouri Pacific Railway. The contract was confirmed by correspondence. The petition set forth these facts, and further that on August 4 defendant tendered on the contract one car of wheat billed to New Orleans as instructed by plaintiffs, and that on August 5 defendant wired plaintiffs, "Can you use wheat on contract billed to you at Chicago? Wire answer"; to which plaintiffs at once replied, instructing defendant to bill the wheat to plaintiffs at Chicago. It averred that defendant failed and refused to ship the remaining 4000 bushels during the month of August, although importuned by plaintiffs to do so; and that upon such refusal the plaintiffs, pursuant to the contract, went into the open market and purchased for defendant's account at the then reasonable price, the same amount of No. 2 hard wheat, paying therefor 39.9 cents a bushel above the contract price. Plaintiffs asked judgment for $1596, the amount of the difference in prices.

The answer admitted the sale by phone to plaintiffs of 5000 bushels of wheat of the grade mentioned, but alleged the wheat was to be paid for by sight draft with bill of lading attached as each car was loaded, which draft the plaintiffs were to pay when presented at Wichita. It denied that the written confirmation of plaintiffs correctly stated the terms of the verbal contract. It averred that on August 1 the defendant, following instructions in letters from plaintiffs that the wheat be shipped to New Orleans for export, shipped one car of wheat and drew on plaintiffs for $720, but that on August 4 the draft, upon presentation to plaintiffs, was protested and payment thereon refused. The answer further alleged that the contract "was canceled by the breach of plaintiffs and their refusal to pay said draft and the demand by plaintiffs to ship said wheat on arrival drafts, and that at no time until plaintiffs broke said contract by refusing to pay for said wheat did defendant refuse to deliver the same. That after plaintiffs failed to take said wheat and pay for same according to agreement, and protested the draft drawn therefor, it refused to ship any more wheat to plaintiffs, and is without fault, that it had a right to cancel said contract and that it did so, and is not indebted to plaintiffs."

Attached to the answer were copies of correspondence between the parties, including letters from plaintiffs in July directing that the wheat be billed to New Orleans for export; also plaintiff's letter dated August 1 confirming a telegram of the same date. The letter reads:

"We wired you to-day as follows: 'Hold billing of wheat until further notice from us.' While we don't want you to think that we are not going to protect our contracts sooner or later, since the embargo has been extended on Galveston and on account of the unsettled condition prevailing throughout the entire world such as foreign wars, impending railroad strikes, etc., we have advised each one of our customers not to bill anything for us until the situation clears up. Bankers everywhere are uneasy and this embargo already has forced us to carry an immense lot of wheat and at present we don't care to jeopardize our credit or our commercial standing by trying to do the impossible. If you find you have to bill grain and can make drafts payable on arrival of car at destination, no doubt we can take care of a limited amount of it. If you care to handle it in this way, you may write us and we will write you billing. You do not need to telephone or telegraph as that is a needless expense.

We are indeed very sorry for the prevailing conditions, but these are things of which we have no control."

The reply admitted that payment of defendant's draft for the first car of wheat was refused, but it alleged that on August 4, the day it was presented, plaintiffs called defendant by phone and explained that owing to the outbreak of the European war an embargo placed by railroads on shipments to Gulf ports, and the refusal of banks to discount drafts with bills of lading attached, plaintiffs could not then take care of the draft, but that if defendant would call back the draft and draw an arrival draft on the car, they would arrange for its payment and would give the defendant billing for the rest of, the 5000 bushels to markets other than Gulf ports for export. It alleged that defendant agreed to withdraw the draft and await plaintiffs' further instructions as to handling the wheat purchased. The reply denied that defendant canceled the contract for the reason alleged, and on the contrary averred that defendant recognized the same as valid and reaffirmed it by wiring plaintiffs on August 5, after it was advised of the non-payment of the draft, asking if plaintiffs could use the wheat billed to Chicago, to which plaintiffs at once replied affirma-tively and directed defendant to bill the wheat to Chicago.

The manager of plaintiffs' business at Wichita testified that he talked with Mr. Miller, defendant's manager, on the afternoon of August 4, and told him the draft attached to the bill of lading had not been paid and explained the unsettled conditions which made it impossible for them to protect it; that at that time he knew the draft had been presented, but did not know it had been protested; that Miller said he could have the draft held for a few days, and that he told Miller it might be possible they could bill the rest of the wheat to Chicago as some grain was moving that way. He testified that on August 5 he received from defendant the following letter, dated August 4:

"As per conversation over the phone this p. m. with your Mr. Wallingford about the protest on /draft for car No. 99247 B. & O., wish to say that, while we were talking over the phone, our banker came in with a telegram saying that the draft had been protested, hence we thought that the best course to pursue was to let it be returned, and when we get your instructions, we will have the draft, and can then. follow out your instructions. We are sorry that you did not get us in time, so that we could have saved you the protest."

It was on August 5 that defendant wired asking if plaintiffs could use the wheat at Chicago, to which plaintiffs replied in the affirmative and directed that the wheat be billed to Chicago.

The evidence shows without dispute that on August 4 the market price of wheat, basis Bushton, ranged from sixty-two and one-half to sixty-seven cents. On August 5 the price was sixty-seven cents, the same as the contract price at which defendant had agreed to deliver. This was the date of the telegram just referred to. On August 6, when defendant wrote plaintiffs rescinding the contract and stating as reasons therefor that plaintiffs had refused on August 4 to pay the $720 draft, the price at Bushton had risen to seventy-four cents. On the 7th, when plaintiffs received the letter notifying them of defendant's intention to rescind the contract, the price had risen to about seventy-eight cents, and after that, in the language of one witness, it "went up like a sky-rocket."

Among the findings of the jury in answer to questions submitted by plaintiffs are the following:

"1. What, if anything, did plaintiffs fail to do, that they should have done under their contract with defendant of July 10, 1914, the contract in question? A. They should have taken care of sight draft for car in transit to New Orleans. Also, they breached their contract with defendant when they informed him they could n't handle wheat only with delivery draft attached—(on Aug. 1st?).

"2. If you find that plaintiffs failed to do anything that they should have done under their contract with defendant, then state on what date defendant, or its agent, first learned of such failure or default on the part of plaintiffs. A. On August 4 by telephone. Also when he received letter referred to above in answer to No. 1.

"3. On what date did plaintiffs first learn from defendant that defendant wished to cancel the contract of July 10, 1914? A. When he got defendant's letter of August 6th.

"4. Was defendant informed on August 4th, 1914, that plaintiffs had not taken up its draft for $720 attached to bill of lading showing shipment of one car of wheat by defendant to plaintiffs on the contract in question? A. Yes.

"5. After defendant learned that plaintiffs had not taken up its draft for the purchase price of the car of wheat shipped by it to them, said draft being for the purchase price of said car of wheat, did not defendant ask for and get from plaintiffs instructions relative to the billing of the rest of the wheat covered by the contract? A. Yes, he asked for prompt and got delayed instructions, but not in accordance with the original contract.

"8. After defendant company had learned that plaintiffs had not paid for the car of wheat shipped by it to them on contract, by failing to pay the draft presented to them on August 4, 1914, with bill of lading attached, what, if anything, did defendant say or do, which induced plaintiffs to believe that it intended to ship the rest of the 5000 bushels of wheat covered by the contract of July 10, 1914? A. Sent telegram asking if plaintiff could use wheat on contract billed to him at Chicago.

"9. Did plaintiffs, at the time that they failed to take up the draft of defendant presented to them for payment on August 4, 1914, say or indicate to defendant that they renounced the rest of the 5000 bushel contract, and did not intend to be bound thereby? A. No, they did not.

"10. At the time that defendant first learned of any failure on the part of plaintiffs to comply with every part of their contract with defendant of July 10, 1914, was the price of No. 2 hard wheat, basis Bushton under the same terms as covered by said contract, higher or lower than the price of wheat on the same basis at the time when plaintiffs first learned from defendant that defendant desired to cancel its said contract with plaintiffs? A. Lower.

"11. Was the reasonable market value of wheat at Bushton, under the same terms as expressed in the contract between plaintiffs and defendant, higher or lower than the contract price on August 4, 1914? A. Slightly lower.

"13. Was the reasonable market value of wheat at Bushton, under the same terms as expressed in the contract between the plaintiffs and defendant, higher or lower than the contract price on August 6, 1914? A. Slightly higher.

"14. Could plaintiffs, immediately after learning that defendant wanted to cancel its contract with plaintiffs of July 10, 1914, or at any time thereafter during the month of August, 1914, have bought in the amount of wheat unshipped by defendant on said contract at a price basis Bushton, equal to or lower than the contract price of sixty-seven cents per bushel basis Bushton? A. No."

In answer to questions submitted by defendant the jury made the following findings:

"Did not the plaintiff commit the first breach of the contract by failing to pay the sight draft for the car of wheat shipped August 1, 1914? A. Yes.

"Did not plaintiffs, at about six o'clock in the evening of August 4, 1914, promise the manager of defendant company that he would write him full instructions and make arrangements to care for the draft which had been protested and that he would so write him that night? A. Yes.

"Did the plaintiffs pay or arrange to pay or provide for the payment of the sight draft which was protested or write the defendant with reference to the same as agreed in the conversation over the telephone the evening of the 4th of August, 1914, at any time before August 6, 1914? A. No.

Wallingford v. Grain Co.

"Did the defendant send the telegram of August 5, 1914, 'Can you use wheat on contract billed to Chicago? Wire answer,' relying on the promise of the plaintiff made over the telephone to write instructions on the night of August 4, 1914, with reference to the payment of the draft which had been protested? A. Yes.

"Did not defendant after sending telegram of August 5, 1914, receive back the draft protested with the bill of lading attached? A. Yes.

"Did not defendant, after receiving back the protested draft and bill of lading, notify plaintiffs by the letter of August 6, 1914, that the contract was canceled for the reasons stated in the letter? A. Yes.

"Did the plaintiffs, ever at any time before bringing this action, offer to pay to defendant the protested draft with the cost of the protest fees thereon? A. No.

"Did the defendant ever waive plaintiffs' breach of the contract in failing to pay the draft? A. No. The including of the words 'on contract' in telegram of August 5th, saved such telegram from being a waiver."

1. Plaintiffs' letter confirming the purchase of the wheat by phone was accepted and retained by the defendant, except for a slight change in one particular which has no bearing upon the controversy, and therefore the terms of the contract as stated in the written confirmation are controlling. (*Strong v. Ringle*, 96 Kan. 573, 152 Pac. 631.) In the opinion in that case it was said:

"In order to avoid the consequences of misunderstandings, defects of memory, in some instances hypertrophy of memory, and in other instances equivocation or downright untruthfulness, those engaged in the grain business have adopted a method of rendering the result of their oral negotiations definite and certain. After oral negotiations have been concluded one of the parties immediately states the result in writing and submits the writing to the other for approval. It is the duty of the recipient of the writing to communicate his objections to the other party, if he have any, and to decline performance if unwilling to be bound by it." (p. 575.)

The written confirmation, after stating the terms as to prices, destination and weights, reserved the right to change destination of all shipments, and also the right to buy in the grain for the seller's account if shipments were not made according to contract. It contained other provisions which plaintiffs contend should be construed so as not to require payment for the wheat until it was delivered and accepted at New Orleans. They contend that the court erred in construing the contract when it charged that plaintiffs breached it by failing to

pay the draft for the first car before it reached its destination, and in charging the jury that defendant was not obliged to ship the rest of the wheat unless it waived this breach of the contract. In the view we have taken of the case it is not deemed necessary to consider these contentions.

2. The theory upon which plaintiffs brought the action was that defendant had waived any right to rescind the contract it may have had by reason of plaintiffs' failure to pay the draft for the first car of wheat. This became, and throughout the trial continued to be, the determinative question. The plaintiffs requested a number of instructions upon the law of waiver based upon the rule declared in *Capper v. Paper Co.*, 86 Kan. 355, 121 Pac. 519. These instructions were refused. It is true the court instructed that if the jury believed from the evidence that anything was said or done under the contract by the defendant to induce plaintiffs to believe that failure to pay the draft was waived the defendant would be estopped to claim afterwards a breach by reason of nonpayment; but the court had already given instruction No. 7, which allowed the jury to excuse defendant from the consequences of such waiver, provided they found that defendant "afterwards, without fault on the part of the plaintiffs, arbitrarily breached the contract by refusing to fulfill it, on some other ground than that of the fault of the plaintiffs." The jury found that defendant did induce plaintiffs to believe it was going to ship the rest of the wheat but that this constituted no waiver. The letter written by defendant on the evening of August 4, following the telephone conversation in reference to the protested draft, is itself sufficient to establish the waiver. It shows not only the cordial relations between the parties, but the entire absence of any purpose on the part of defendant to rescind the contract, at least while the price of wheat remained where it was. The letter reads:

"As per conversation over the phone this p. m. with your Mr. Wallingford about the protest on draft for car No. 99247 B. & O., wish to say that, while we were talking over the phone, our banker came in with a telegram saying that the draft had been protested, hence we thought that the best course to pursue was to let it be returned, and when we get your instructions, we will have the draft, and can then follow out your instructions. We are sorry that you did not get us in time, so that we could have saved you the protest."

Followed, as this letter was, the next day by a telegram asking if plaintiffs could use the "wheat on contract" billed to Chicago, the jury could do no less than find that defendant did induce plaintiffs to believe that it intended to ship the rest of the wheat. But the jury found that this did not constitute a waiver of the nonpayment of the draft. This finding makes it apparent that the jury were misled by instruction No. 7, which permitted them to explore the field of speculation in an effort to discover *"some other ground"* upon which to avoid the waiver. And so, when asked the question, "Did defendant ever waive plaintiffs' breach of the contract in failing to pay the draft?" the jury answered: "No. The including of the words 'on contract' in the telegram of August 5 saved such telegram from being a waiver." On the contrary, instead of saving the message from constituting a waiver, the use of the words "on contract" only served to eliminate any possible doubt as to what particular wheat the defendant wanted permission to ship to Chicago. The courts do not need the aid of a jury to translate the meaning or declare the legal effect of plain, unambiguous language used in a telegram relating to everyday business affairs, and will not permit the rights of parties to be frittered away by an arbitrary finding of a jury declaring the legal effect of such an instrument to be something opposed to reason and common sense. Besides, in so far as the finding becomes a question of law, it is for the courts to determine and not for the jury. (See *Capper v. Paper Co., supra.*)

3. The plaintiffs insist it was error to deny their motion for judgment on the special findings. The jury were asked to state what if anything plaintiffs did or failed to do that they should have done under the contract. The answer was:

"They should have taken care of sight draft for car in transit to New Orleans. Also they breached their contract with defendant when they informed him they could n't handle wheat only with delivery draft attached—(on August 1st?)."

The jury also found that defendant first learned on August 1 by letter that plaintiffs would require arrival drafts, and first learned of the failure to pay the draft on August 4. They further found that plaintiffs were not notified until August 6 that defendant would not furnish the rest of the wheat; and

that after defendant had learned that plaintiffs had allowed the draft to be protested, and after notice of the refusal to accept sight drafts before arrival of the wheat at destination, the defendant induced plaintiffs to believe that it intended to ship the rest of the wheat covered by the contract.

It would be unconscionable to permit the defendant to rescind the contract after the wheat had suddenly advanced in price and to base its right to rescind upon grounds which it had notice of and was willing to forgive so long as the price of wheat remained at or below the level of prices when the contract was made.

In *Capper v. Paper Co.*, 86 Kan. 355, 121 Pac. 519, an instruction was approved which charged in substance that if plaintiff failed to make payments as provided in the contract, and this provision had not been waived, the defendant had a right to cancel; but if the jury should find from the evidence that anything said or done under the contract induced plaintiff to believe that this condition was waived the defendant would be estopped from afterwards claiming nonperformance.

In the present case the evidence and the findings are, that defendant, with notice of the very things which the jury declare constituted the breach by plaintiffs, induced plaintiffs to believe that they would ship the rest of the wheat, in other words, it waived the breach; and it then follows as a matter of law that defendant could not afterwards, and when the price of wheat had risen, take advantage of the breach and rescind the contract. The plaintiffs were entitled to judgment upon the findings for the amount paid by them as shown by the findings for the wheat defendant failed to deliver.

The judgment is reversed and the cause remanded with directions to render judgment in accordance herewith.

---

OPINION DENYING MOTION FOR MODIFICATION OF JUDGMENT.

Filed April 7, 1917.

There is a motion asking for a modification of the judgment, the claim being that the price at which plaintiffs bought in the wheat on September 4, is not the true measure of damages. The wheat, however, was not bought, as the de-

Wallingford v. Grain Co.

fendant claims, for "August delivery." According to the confirmation it was purchased for "August shipment," and if defendant had shipped the wheat on August 31, as it had the right to do, and had drawn drafts with bills of lading attached, September 4 would have been the time when, in the regular course of business, the drafts would have been presented. Plaintiffs' testimony is that they never notified the defendant that they would not accept the wheat; and their letter to defendant dated August 7 was sufficient notice that plaintiffs expected to look to defendant for the wheat. The special findings are that at no time between August 6 and September 4 could the plaintiffs have bought in the wheat at or lower than the contract price. It was a matter of pure speculation whether by extending to defendant the full time for delivery the damages would be less or greater. It is true, as defendant asserts, the time of shipment or delivery during the month of August was wholly optional with defendant, but defendant exercised no option except to say on August 6 that it would not deliver at all.

In *Mercantile Co. v. Lusk,* 45 Kan. 182, 25 Pac. 646, the general rule stated in Benjamin on Sales, section 1118, in a case where the buyer refuses to accept, was quoted as follows:

" 'The date at which the contract is considered to have been broken is that at which the goods were to have been delivered, not that at which the buyer may give notice that he intends to break the contract, and to refuse accepting the goods.' (5 M. & W. 475; 96 Ill. 13; 108 Ill. 170.)" (p. 183.)

And it was said that the exact converse of this rule should be applied to a case where a seller breaches the contract by refusing to deliver. Among the authorities cited is *Windmuller v. Pope,* 107 N. Y. 674, 14 N. E. 436, holding that the time of delivery, and not the time when the seller gives notice that he intends to break the contract, is the rule.

The plaintiffs, in a brief filed in opposition to the motion to modify the judgment, concede that if at any time between August 6 and the expiration of the time for delivery plaintiffs could have bought in the wheat at or lower than the price agreed upon, it would have been the duty of plaintiffs to have done so, in accordance with the rule declared in *Lumber Co. v. Lumber Co.,* 86 Kan. 131, 119 Pac. 321. But the finding of the jury is that this could not have been done.

In a case just decided (*Flour Mills Co. v. Dirks*, post, p. 376), the contract as extended gave the seller until January 15 to deliver the wheat, and the measure of damages was held to be the difference between the contract price and the market price at the place of delivery on January 15.

The time of shipment was during the month of August, and in the circumstances of this case the measure of damages is the difference between the contract price and the market price at the place of delivery at the time the wheat would have been delivered if shipped at the close of August 31. 'It has been held that the burden rests upon, or rather that it is incumbent upon, the defaulting seller, where the bargain was for delivery by installments, to produce evidence that the buyer could have gone into the market and obtained another similar contract on such terms as would mitigate his damages. (See authorities cited in *Mercantile Co. v. Lusk*, supra, where this rule as to evidence was adopted.) The defendant offered no evidence of any kind upon the measure of damages, choosing to stand upon his right to cancel the contract, and now for the first time raises the question. The fact that plaintiffs could have elected to sue at once upon notice of defendant's intention to breach the contract (*Caley v. Mills*, 79 Kan. 418, 100 Pac. 69) does not control the measure of damages. Plaintiffs did not elect to sue until the expiration of the full period in which defendant might have shipped the wheat. In a recent case, *Flour Co. v. Brandt*, 98 Kan. 587, 158 Pac. 1120, the general rule declared in *Stewart v. Power*, 12 Kan. 596, and *Mercantile Co. v. Lusk*, supra, was recognized as the correct one, that the purchaser should buy in at the time and place of delivery. In the case at bar delivery was to be at Wichita on shipments made at any time during August. In the opinion in *Flour Co. v. Brandt*, supra, it was said:

"The damage to plaintiff was caused by the defendant. He could have prevented damage to the plaintiff by performing the contract on any of the days that he might select. He refused to perform his contract and compelled the plaintiff to adopt such measures as he deemed best to reduce his losses. The defendant ought not to be permitted to cast on the plaintiff the burden of reducing these losses and then say that the plaintiff could have better reduced the losses by purchasing wheat on a different day." (p. 588.)

The motion to modify the judgment is denied.